## In the matter of the WORLD'S SAFE INSURANCE COMPANY.

A certificate of persons appointed by the comptroller, under the general insurance act of 1853, to examine into the affairs of a company about to be organized, stating that the company has its capital in cash and bonds and mortgages, "as appears to our satisfaction by the evidence of the fact produced to us," is insufficient.

The commissioners must. certify that the bonds and mortgages possessed by the company as capital are such as are required by the eighth section of the act.

The statute vests in the supreme court very full authority as to insurance companies; and it is the plain duty of the court to see that the law intended for the protection of the public, is substantially complied with. *Per* PECKHAM, J.

If the funds of a company substantially equal the amount of the capital, either in cash or in the kind of securities pointed out in the eighth section of the statute, it should be allowed to continue its business, so far as respects the question of the sufficiency of its funds. If they substantially fall short, the company should be dissolved. This is not a question of discretion.

Public policy demands that the provisions of the statute, for the safety of the assured, prohibiting a company from doing business until it is certified that the capital has been paid in, either in money or in such stocks and bonds and mortgages as are required by the eighth section, should be enforced with sternness and rigor. *Per* PECKHAM, J.

If mortgages constitute a part of the capital they must satisfy, in substance, the demands of the law, and be first liens on lands worth at least fifty per cent more than the amount mentioned therein, irrespective of farm buildings.

It is enough, however, to prevent the dissolution of a company, within the spirit of the act, if the assets are sufficient at the time of the hearing before the referee, though insufficient at the time when the application for a dissolution was presented.

Where the assets of a company which should have a capital of $100,000 in money, or in bonds and mortgages upon real estate worth $150,000, consisted only of mortgages on lands worth in the aggregate $125,000, a portion being wild lands; and it had never been certified by the commissioners appointed by the comptroller that its capital had been paid in; and the company had no substantial *bona fide* directory, as required by law, but its business was conducted in a loose, irresponsible and unsatisfactory manner; its securities being withdrawn, and changed, at the pleasure of those who assigned them; and the names of its stockholders were not known; *Held* that the company should be dissolved, because of the insufficiency of its assets, and because the interests of the public so required. GOULD, J. dissented.

THIS was an appeal from an order made at a special term, re-
fusing to dissolve this company and distribute its effects.
There had been an investigation on behalf of the state, into the
affairs of the company, under section 24 of the act of June 25,
1853, to provide for the incorporation of fire insurance compa-
nies. (*Laws of* 1853, *p.* 917.) The superintendent who made
the investigation was of opinion that the assets of the company
were insufficient to justify its continuance in business. That
fact being communicated to the attorney general, that officer
procured an order from this court for the company to show
cause why its business should not be closed. Under that
order the proceedings were had before a referee, which were
now before this court for review.

It appeared in evidence that upon the organization of the
company three persons were appointed by the comptroller to
make an examination, two of whom certified, under oath,
that the capital of said company, $100,000, had been .paid
in "in cash and bond and mortgage, as appears to our satis-
faction by the evidence of the fact produced to us." The
special term having refused to dissolve the company, upon
the coming in of the report of the referee, the attorney gen-
eral appealed from the decision.

*Henry Smith,* for the appellant.

*W. A. Beach,* for the respondent.

PECKHAM, J. It will be observed that the certificate given
by the persons appointed by the comptroller wholly fails to
comply with the statute. It does not state the amount of
money paid in, or that the bonds and mortgages were such
as were required by the eighth section of the insurance act,
of 1853. The certificate might be true, and yet the require-
ment of that section of the statute be in no manner complied
with. The eighth section of the act required that the bonds
and mortgages should be secured upon unincumbered real

estate within the state of New York, worth fifty per cent more than the sum loaned, exclusive of farm buildings. In other words, worth fifty per cent more than the amount of the security by bond and mortgage. There is no intimation in the certificate that the mortgages were of that character. The act expressly requires these commissioners to certify that the bonds and mortgages possessed by the company as capital are such "as are required by the eighth section of this act." They simply certified that the company had its capital in cash and bonds and mortgages "as appears to our satisfaction." What kind of bonds and mortgages? They do not say.

(After discussing the facts, the judge proceeded as follows :)

The circumstances already alluded to, touching the organization of this company tend to awaken suspicion as to its character. The statute under which this court is now acting, authorizes it to dissolve this company, if it shall appear to the satisfaction of the court that the funds of the company are not sufficient to justify its continuance in business or that the interests of the public so require. (§ 24.) This statute vests in this court very full authority as to such companies. Its plain duty is to see that the law intended for the protection of the public is substantially complied with.

When should this court be satisfied that the funds of the company are insufficient to justify its continuance in business ? The answer, in my judgment, is clear and plain, and is found in the provisions of the eighth section of the statute. What authorizes it to commence business authorizes it to continue. If its funds substantially equal the amount of its capital, either in cash or in the kind of securities pointed out by that section, it should continue, so far as respects the question of the sufficiency of its funds. If they substantially fall short, the company should be dissolved. This is not a question of discretion, but of clear law. The eighth section seems to contemplate that the capital should first be paid in in cash, and that it might afterwards be loaned on the securities

therein specified. But the tenth section allows a company to organize and issue policies on its being certified that the capital has been paid in, either in money, "or in such stocks and bonds and mortgages as are required by the eighth section of this act." Such a certificate this company never obtained. The company, then, to go on, must substantially have its capital in money, or in the stocks and bonds and mortgages of the character just specified.

It would be absurd to say that a company could not organize without the bonds and mortgages on unincumbered real estate worth fifty per cent more than the mortgages, but if it should once get under way by a certificate a week old, however false, it might then go on though the land mortgaged were incumbered, or not worth the face of the mortgages. The statute intended that the capital should be secured, so that creditors and claimants should get their pay when they called for it; and it intended to give that security by having the mortgages on unincumbered lands worth fifty per cent more than the mortgages.

The legislature knew, as every one knows, that if lands are sold at a forced sale, it is not at all unusual that they fail to realize two-thirds of their value. It is urged that there is difficulty in obtaining such mortgages as the statute requires. Then go to the legislature for a change of the law, not ask the courts to repeal the statute by construction. The statute as to banking requires land of double the value for which it is mortgaged, and we know how often those mortgages have proved deficient when banks have failed; no business man would ordinarily loan his money upon less security than this statute requires. The law, as it stands, is exceedingly loose in allowing companies to organize at all by putting in bonds and mortgages as cash. The permission is calculated to facilitate frauds. If the company had the cash, it could invest far more safely, and ordinarily would do so. It is no answer to say that, if the court is not satisfied that the funds are insufficient, the company should not be dissolved, and that the

court may be satisfied with such evidence as it thinks proper. This would afford no safe rule whatever. One person may be satisfied that bonds and mortgages worth $10,000 are sufficient to authorize a company to go on when its capital is $100,000; that solvency is all that is required, and in the early days of a company it can owe but little, in the ordinary course of events; that such a business is usually successful, and money will be earned to meet its liabilities. This is specious and plausible; but the statute says it shall not do business at all, unless its whole capital is paid in in cash or in certain prescribed securities. And all know how frequently insurance companies have failed and how often the insured have been defrauded. Public policy, in my opinion, demands that these provisions for the safety of the insured should be enforced with sternness and rigor. I am not disposed tô relax them in any degree. The mortgages must not be good to " our satisfaction," but they must satisfy in substance the demands of the law; be first liens on land worth at least fifty per cent more than the mortgages, irrespective of farm buildings. Parties under such organizations are shielded from all personal liability. They may incur liabilities without limit, and hazard nothing in the experiment but the assets put in the company. Those assets should substantially meet the requirements of the law, or the company should be dissolved.

I think it is enough however to prevent a dissolution, within the spirit of this act, if the assets are sufficient at the time of the hearing before the referee, instead of the time when the application was presented. The object is security to the creditors of the company, not its punishment for past offenses.

The literal language of the act allows the construction claimed by the appellant, that the referee is " to inquire into and report upon the facts stated therein;" that is, in the application of the attorney general. But the prior part of the same section says, in case it shall appear " that the assets of said company are not sufficient," &c. it shall be dissolved, and in another part the comptroller, though he finds the

assets deficient, may require the deficiency to be supplied within a given time, or other consequences will follow. These provisions, in connection with the general policy of the law, indicate that the safety of the creditors though secured at the time of the hearing was all that was desired.

Tested by these rules, how stood the company at the hearing? The referee finds in general terms, that in his "opinion the aggregate amount of the mortgages, to wit, $169,000, is secured upon property of sufficient value to make such mortgages in the aggregate ample security for at least the amount of the capital stock of the company." By this is not meant that each mortgage is upon property of sufficient value to constitute it in itself a valid security for the whole amount of such mortgage. That in some instances it is worth much more, and in others much less than the mortgage. That in cases where the land is worth less, he has only allowed the mortgage to the value of the land. He estimates the aggregate value of the property covered by the Andrews mortgages, put in and received at $46,000, at not to exceed $27,000. This includes a mortgage for $600 upon property held adversely to the mortgage and the title to which is in dispute, and the referee does not decide as to its validity. By the Cutler mortgage, put in and taken by the company at $38,350, at not to exceed $30,000. Of these he says mortgages to the amount of $15,525 are each upon property of much greater value than the mortgages respectively. But two of these, amounting to $6250, are subject to prior incumbrances, though he says the property was proved to be worth more than double the amount of the prior incumbrance added to the company's mortgage. By the Buck mortgages, irrespective of those upon the 10,808 acres of wild land, not to exceed $28,000. But I have already shown that the company had no pretense of title to any of the Buck mortgages except the three mortgages severally given by Weed, Sherman and Witherill for $13,109, Nos. 12, 13 and 14; twelve given for $11,500, which from the average of the evidence is not worth

one-third of its face, but is secured by a collateral mortgage for $4000, and No. 13 for $1000, and No. 14 for $600. These then are all the assets of this company — mortgages on lands worth in the aggregate $67,000, assuming the three Buck mortgages to be worth $10,000, as follows :

Andrews $27,000, Cutler $30,00, Buck $10,000. These are all the assets of a company that should have a capital of $100,000 in money, or if in bonds and mortgages, they should be upon real estate worth $150,000.

But waiving this question of title, assume that the company owns all of the Buck mortgages, the referee then finds, in addition, that the Essex wild lands, 10,808 acres, mortgaged to the company, were worth, from the average estimate of the witnesses, $40,000, making the gross amount in value of the lands mortgaged to the company, $125,000. These are the same mortgages, it is claimed, which constituted the capital stock of the company.

Upon the finding of the referee, therefore, upon the bonds and mortgages alone, and I may add on the most favorable view for the company, the lands mortgaged are deficient in the sum of $25,000.

But it is no safe or reliable rule for a referee simply to take something like an average of valuations given by the respective witnesses, as he says he did. He should look at facts, important controlling facts. They are in this case. These 10,000 acres of wild lands were purchased by Mr. Buck, as he testifies, at auction, at tax sales, at 25 cents per acre, on an average. (He bought most of his other mortgaged lands at tax sales.) They are claimed to be valuable chiefly for their timber, and have been lumbered upon since their purchase. It would seem that the former owners could do no better with them than to allow them to be sold at this average price. Is there the slightest pretense that they would sell now in market for more than their original cost ? Why should they bring more ? The lumber having been cut off to some extent, they have become less valuable since their purchase.

Could a sane capitalist in the state be found who would loan $5000 on those 8000 acres of wild lands? I do not believe it; nor do I believe that they would now bring more than their original cost, if put into the market; not a single fact or reason can be given why they should. It is worse than idle then, in my judgment, to speak of them as worth $40,000. It may be that mortgages upon such wild lands may be taken by a company—though the statute speaks evidently of "farm" lands—estimating their value irrespective of "farm buildings." Had the attention of the legislature been called to the subject, they would doubtless have been expressly excluded.

Many if not most of the other Buck mortgages will bear but little better scrutiny. When persons differ so much in their estimate of the value of lands, it is well to inquire as to the price they brought on the last sale in public open market. It is also clear to my mind that the property in the Cutler and in the Andrews mortgages has been over estimated by the referee. He seems to have lost sight of the old maxim, that witnesses should be weighed, not numbered.

This company advertised in the public papers that their securities were upon lands in Albany, Rensselaer and Saratoga. They said nothing of any lands in Essex county. They did not alarm the public as to their solvency by saying that a large proportion of their securities was upon wild lands in that county, which the owners had allowed to be sold for the taxes upon them.

But it is urged and so reported by the referee, that the company has $10,000 in cash of assets in addition to its bonds and mortgages. The evidence warrants no such conclusion. There is no pretense that it was paid in by either of the parties upon their subscription for stock. Neither of the persons said to have paid it would swear it was so paid; nor did the secretary pretend it was so paid. It is entirely clear it was not so paid. It was not a gift to the company; no witness has pretended or intimated it was a gift. It was then no part of the capital; it was not a gift; it was not paid on any demand

claimed by the company; but it clearly was a simple loan to the company; under the proof it could be nothing else. It was simply an advance to the corporation " to be paid out of the incoming business of the company," to use the language of Mr. Andrews, one of the parties advancing. Without owing the company any thing, they let it have some money. The law implies a promise to repay it. In the report by the company made to the superintendent, soon after its organization, and sworn to by its secretary, (Mr. Kennedy,) and by its president, no allusion is made to any such assets. The assets consist, by that report, of bonds and mortgages only.

This fund then forms no security whatever to the creditors of this institution. If paid back or withdrawn, neither the company or its creditors have any right or remedy in regard to it. It is a mere delusion to call such money assets of the company. Should the company fail this money would of course never be found by its creditors. Again; when we look for this money, like the mortgages, it is largely deficient. Andrews, their secretary, testifies how it was paid in. He says it reached the company by being placed part of it to the credit of the treasurer; 6190 odd dollars were deposited in the Bank of Troy to the credit of the company, John Cutler, treasurer. The balance consisted of notes left with the bank for collection, the proceeds of which were placed to the credit of the company when collected; all of the paper is not due yet—cannot state what portion is collected.

This testimony was given on the 11th of May, 1860; some of the notes therefore must have had four months to run, when this company was organized if they then had any existence; as to their value there is no evidence.

It is entirely clear, then, to my mind, that the assets of this company, either at its organization or at the hearing before the referee, were entirely insufficient to justify its commencement or its continuance in business. At no time has its capital been paid in, either in cash or in bonds and mortgages substantially of the character required by law. It has

never been so certified by the commissioners appointed by the comptroller. It has not been so found by the referee. His findings; erroneous as they are, in some most important particulars, leave a large deficiency. It does not appear, either from the proof or the findings, that a single mortgage of this company is in compliance with the law.

It seems to have no substantial *bona fide* directory, as required by law; but its business is conducted in a loose, irresponsible and unsatisfactory manner. It has actually lost, by the very favorable finding of the referee as to value, in its two purchases of bonds and mortgages of Andrews and Cutler, $26,850; having taken them at $84,350, when their value is found to be only $57,000; and that estimate, in my opinion, is far above their real value.

Its securities seem to be withdrawn, and to be changed, at the pleasure of those who assigned them.

There is no entry, whatever, on its books, as to this $10,000 alleged to have been advanced to the company. It had sustained a small loss of three hundred and odd dollars, and yet paid that small sum by "note." Who its stockholders are is not known.

If the requirements of the law are not to be regarded as a farce, this company should be dissolved, because of the insufficiency of its assets, and because " the interests of the public so require."

HOGEBOOM, J. concurred in the result.

GOULD, J. dissented.

ALBANY GENERAL TERM, May 6, 1861. *Gould Hogeboom* and *Peckham,* Justices.]